IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JOSE E. QUINTANA,

        Plaintiff,

vs.                                                                                                         No. CIV 01-988 MCA/LFG

JOE GARRNET and JESSE LEURA,

        Defendants.

**MAGISTRATE JUDGE'S ANALYSIS
AND RECOMMENDED DISPOSITION**[1]

This is a *pro se, in forma pauperis* civil rights action brought by Plaintiff Jose E. Quintana ("Quintana") under 42 U.S.C. § 1983. Quintana alleges in his complaint that Defendants Joe Garrnet (whose correct name is David Joel Garnett, *see* Answer [Doc. 9], and who will hereinafter be identified as "Garnett"), and Jesse Leura (whose correct name is Jesse Luera, *see* Answer [Doc. 9], and who will hereinafter be identified as "Luera") violated his constitutional rights by illegally detaining him on two occasions, and by failing to provide adequate medical care for a broken wrist and rib and for post traumatic stress disorder, while he was incarcerated at the Quay County Detention Center ("QCDC"). At the time of the incidents in question, Garnett was Director of QCDC, and Luera was Assistant Director.

---

[1] Within ten (10) days after a party is served with a copy of this legal analysis and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such analysis and recommendations. A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the analysis and recommendations. If no objections are filed, no appellate review will be allowed.

Defendants filed their Answer, and the Court thereafter ordered [Doc. 13] that a Martinez Report be submitted, pursuant to Martinez v. Aaron, 570 F.2d 317, 320 (10th Cir. 1978). The parties were notified that the Martinez Report could be used in deciding whether to grant summary judgment on Plaintiff's claims, and that the parties should submit whatever materials they consider relevant to the claims. [Doc. 13, at 2].

Defendants filed their Martinez Report [Doc. 14], along with affidavits and exhibits, and Quintana filed his Response [Doc. 15], with exhibits. The Court has reviewed the file, including the Martinez Report and Quintana's response thereto, and construed the *pro se* pleadings liberally, holding Plaintiff to a less stringent standard than that required of a party represented by legal counsel, Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 596 (1972); Gillihan v. Shillinger, 872 F.2d 935, 938 (10th Cir. 1989), while bearing in mind that this legal construction does not relieve Plaintiff of his burden of presenting sufficient facts to state a legal claim. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). Defendants ask the Court to dismiss the action in light of the evidence submitted by the parties, and the Court finds that this matter is now ripe for resolution on summary judgment.

Pursuant to Rule 56(c), Fed. R. Civ. P., the Court may grant summary judgment if the pleadings, affidavits, and exhibits show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The opposing party must be given notice and an opportunity to respond, as provided in Rule 56. Hall v. Bellmon, at 1111.

Having submitted a Martinez Report, Defendants are in the position of movants for summary judgment and as such, they carry the burden of establishing that there is no genuine issue of material fact. They may discharge this burden by showing there is an absence of evidence to support the

plaintiff's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986). Once the defendants meet their burden, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on a material matter. Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).

The party opposing the motion may not rest on his pleadings, mere argument or contention, but must set forth specific facts showing there is a genuine issue for trial as to these dispositive matters for which he carries the burden of proof. Summary judgment is appropriate if there is insufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict for that party. Anderson v. Liberty Lobby, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986); Celotex Corp., 477 U.S. at 324.

**Illegal Detention**

Quintana claims that he was illegally detained on two separate occasions at QCDC. The first occasion was from the date of his arrest on September 25, 1998 until November 23, 1998, when he was released on bond. The second occasion was from his arrest on January 15, 1999 until July 19, 1999, when he was transferred to Randall County, Texas.

After reviewing the evidence, the Court concludes that Defendants, as Director and Assistant Director of the Detention Center, did not violate Quintana's constitutional rights in holding him at QCDC on these two occasions and recommends that summary judgment be granted in Defendants' favor on this claim.

A. The 1998 Detention.

On September 25, 1998, Quintana was arrested by a Quay County Deputy Sheriff in Tucumcari, New Mexico, on charges of trafficking in heroin. *See*, Criminal Complaint and Statement of Probable Cause (Exs. 1 and 2 to Martinez Report, hereafter cited in the form, "MR Exs. 1 and 2").

He was booked into QCDC on that date and held there on the drug charges. (MR Ex. 3).

In the Martinez Report, Defendants state that, at the time of his arrest, Quintana was under the supervision of the New Mexico Probation Division of the Corrections Department ("APO"). They state that, when the APO received word of Quintana's arrest on the heroin charges, it issued two Arrest Orders to Garnett, commanding him as Director of QCDC to hold Quintana for further investigation into possible probation violations. Defendants include with the Martinez Report copies of these two Arrest Orders (MR Exs. 4 and 5).

The first Arrest Order, number 10-98-51, is dated September 25, 1998. It reads:

> The above named offender is under the supervision of the New Mexico Probation Division of the Corrections Department. The below signed officer has reason to believe that the offender has violated the conditions of his parole in that the offender: Was in Poss[ession] of Heroin.

The Arrest Order goes on to state that Quintana's detention is necessary because he poses a risk to himself and the public and has committed multiple probation violations. (MR Ex. 4). The second Arrest Order (number 10-98-54) was issued on November 5, 1998 (MR Ex. 5) and commands Garnett to hold Quintana "pending new charges."

Quintana was arraigned on September 28, 1998 on the heroin charges (MR Ex. 6), and bond was set by the Court at $5,000. According to Defendants, Quintana did not post bond until November 23, 1998. *See*, Release Order and Bond (MR Ex. 7). Quintana disputes this. He states in his response [Doc. 15] to the Martinez Report that he had never seen the Arrest Orders prior to receiving the Martinez Report, and "I can promise you that I was never arrested and booked into the jail on these charges. Those orders were never executed." He asserts that he paid the 10% bond amount on September 28, 1998, and he should have been released on that date. He says the interim

4

period was an illegal detention, and "[t]he only reason I was released on 11-23-98 was because my family was constantly calling the jail and courts on my behalf."

Quintana eventually pled no contest to the heroin charge which was the subject of the September 25, 1998 Criminal Complaint, and he was sentenced on July 15, 1999.

With regard to this first detention, the Court agrees with Defendants that, as administrators of the Detention Center, they were bound by provisions of law to hold Quintana and could not have released him, even if they had wanted to, and hence did not violate Quintana's constitutional rights by holding him during this time period.

On September 25, 1998, Quintana was arrested by a Quay County deputy sheriff on heroin charges, without a warrant but on probable cause. A Criminal Complaint was filed that same date. Quintana later pled guilty to drug charges arising from this arrest. Even without the APO Arrest Orders, which Quintana asserts he never saw, the QCDC Defendants had no choice but to detain Quintana following the arrest, booking, and filing of the Criminal Complaint. N.M.S.A. § 33-3-13 provides:

> All persons charged with crime committed in the state, while awaiting indictment or trial on such charges, shall be incarcerated in the county jail of the county wherein such crime is alleged to have been committed ...

The jail administrator is obligated by law to keep the arrested person in custody "until further steps, as provided by law, are taken to obtain the prisoner's liberty," and "[a]ny jailer who deliberately and knowingly releases a prisoner without an order of release . . . is guilty of a misdemeanor and shall be removed from office." N.M.S.A. § 33-3-12.

It is undisputed that no order of release was issued by a court until November 23, 1998.

Defendants state that this is the date on which bond was posted, while Quintana claims that he posted bond on September 28, 1998, the date of his arraignment. There is nothing on the record to support Quintana's assertion. The documents submitted by Defendants were accompanied by the affidavit of Bennie Martinez, Assistant Director of QCDC, asserting his personal knowledge and attesting that the exhibits attached to the Martinez Report "are true and correct copies of all of the records that have been located in the possession, custody or control of the County related to the incarceration and detention of the Plaintiff Jose E. Quintana at the Quay County Detention Center, which the Court has ordered to be produced in this matter." (MR Ex. A).

Quintana's bare allegation that he posted bond prior to November 23, 1998 does not create an issue of fact and is insufficient to avoid summary judgment. The fact that the order of release was issued on November 23 supports the assertion that bond was posted on that date and not before. Quintana's only response to this evidence is his bald statement that Defendants are lying. He does not produce any evidence that he, or anyone on his behalf, made requests or demands for his release, or that he filed any grievance or sought habeas corpus during the period he claims he was illegally detained. His claim that Defendants are lying, without more, is insufficient to avoid summary judgment. Once the moving party meets its burden, the party opposing the motion must come forward with specific facts, supported by admissible evidence, which demonstrates the existence of a genuine issue for trial. Anderson, 477 U.S. at 249.

In order to establish a claim for false imprisonment under section 1983, Plaintiff must allege and show that the Defendant government officials acted "with deliberate or reckless intent to falsely imprison the plaintiff." Romero v. Fay, 45 F.3d 1472, 1480 (10th Cir. 1995). The Defendants had a legal obligation to hold Quintana at QCDC until receiving a court order releasing him from custody.

6

That order was issued on November 23, 1998, and he was released that day. The Court concludes that, as a matter of law, the September 25 to November 23, 1998 incarceration did not constitute false imprisonment or an "illegal detention," and did not violate any of Quintana's constitutional rights. Summary judgment is therefore appropriate on this claim.

B. <u>The 1999 Detention</u>.

Approximately six weeks after his November 23, 1998 release on bond, Quintana was arrested again. An Arrest Order (number 10-99-03) dated January 15, 1999 was issued by the Probation Division, commanding the Tucumcari Police Department to arrest Quintana, on information and belief that he violated the terms of his probation. Pursuant to this order, Quintana was arrested on January 15, 1999 and was booked into QCDC. His Arrest/Booking Report (MR Ex. 9) for that date indicates that the charges against him include an "APO hold," and possession of heroin.

The January 15, 1999 Arrest Order is attached as Exhibit 8 to the Martinez Report. Quintana also attaches a copy of this order to his response to the Martinez Report. The copy supplied by Quintana is unauthenticated. It clearly appears to be the same document; however, Quintana's version includes a handwritten notation that is missing from Defendants' version. The note on Quintana's version reads, "in custody pending violation per request of Tx [presumably "Texas"] APO – awaiting rect [presumably "receipt"] of detainer or warrant."

Quintana argues that this discrepancy between his copy and Defendants' indicates that Defendants' version has been "tampered." It is curious that the notation on Quintana's version is missing from Defendants' version. However, the copy submitted by Quintana supports Defendants' version of the facts, and the Court does not see that Defendants would have had any incentive to falsify the document before submitting it in connection with the summary judgment motion.

7

In addition, this January 15 Arrest Order was superseded by a new Arrest Order (MR Ex. 10), also numbered 10-99-03, pursuant to which the APO canceled the January 15 order but commanded the Tucumcari Police Department to continue to hold Quintana, who was still in the custody of QCDC. The new Arrest Order noted that Quintana was "in custody pending revocation per request of Texas APO, awaiting receipt of detainer and or warrant." This language is nearly the same as the handwritten note on Quintana's version of the January 15 Arrest Order. It is apparent that Arrest Order 10-99-03 went through an evolution of some sort between January 15 and March 1; however, the discrepancy between the two January versions is not material to Quintana's claim of illegal detention.

Quintana was still in custody at QCDC on March 5, 1999, when Texas issued a formal arrest warrant (MR Ex. 12) for Quintana and forwarded it to QCDC, apparently on the concern that New Mexico authorities were about to release him. (*See*, MR Ex. 11). Quintana was wanted in Texas for a probation violation involving possession of a controlled substance. Texas requested that a hold be placed on Quintana until he was released by New Mexico, at which time Texas would receive him. (MR. Ex. 12). Formal extradition would not be necessary, as New Mexico and Texas are signatories to an interstate compact for the supervision of parolees and probationers, as provided in N.M.S.A. § 31-5-1 (now repealed, but in effect at all times relevant to this lawsuit); *see also*, MR Ex. B.

Quintana remained in custody at QCDC pursuant to the Texas arrest warrant and pending final resolution of the heroin charges against him in New Mexico. As noted above, on July 15, 1999, the New Mexico charges were resolved when Quintana pled guilty to possession of heroin. (MR Ex. 13).

The Judgment and Sentence on the New Mexico charges, dated July 15, provided that

8

Quintana would be transported to Randall County, Texas for a hearing on the probation violation charge pending in that state, that he would serve his New Mexico sentence in the Texas Department of Corrections, and that the New Mexico sentence would run concurrently with any incarceration ordered in Texas. Quintana was given credit against his sentence for time served from September 25, 1998 to November 23, 1998. The Judgment and Sentence included the District Judge's warrant commanding the Sheriff of Quay County to take Quintana into custody and deliver him to the Randall County Sheriff's Office, Amarillo, Texas. (Id.). Quintana was taken to Texas pursuant to this order on July 19, 1999.

Quintana is still in custody in Texas. He did not post any bond between January 15, 1999 and July 19, 1999. Defendants state, and Quintana does not contest, that "the charges against Mr. Quintana were never dismissed, nor did any Court, the APO, the State of Texas, or any other authority request or specifically order or authorize Mr. Quintana to be released from the Detention Center at any time between January 15, 1999 and July 19, 1999." (Martinez Report, at 5).

Again, Quintana fails to raise a genuine issue of material fact to show that Defendants "acted with deliberate or reckless intent to falsely imprison the plaintiff." Romero v. Fay, *supra*, at 1480. He was held initially on an Arrest Order issued by the APO. The State of Texas thereafter requested that a hold be placed on Quintana, as he was wanted in that state for probation violations involving possession of drugs. Texas later issued a formal arrest warrant for the purpose of taking custody of Quintana once the New Mexico charges were resolved. Defendants state that the January 15, 1999 Arrest Order issued by the New Mexico APO, and formal arrest warrant issued by Texas, "all resulted from the fact that at the time of the Plaintiff's September 25, 1998 arrest, the Plaintiff was still on probation stemming from charges in Texas, and was being supervised by the [New Mexico] APO"

9

(Martinez Report, at 11), and the record supports this statement.

The Arrest Order issued on January 15, 1999, and the superseding Arrest Order dated March 1, 1999, were issued by the APO pursuant to statutory authority. N.M.S.A. § 31-21-15(A)(3) provides:

> At any time during probation . . . the director [*i.e.*, the "director of the field services division of the corrections department or any employee designated by him"] may arrest a probationer without warrant or may deputize any officer with power of arrest to do so by giving him a written statement setting forth that the probationer has, in the judgment of the director, violated the conditions of his release. The written statement, delivered with the probationer by the arresting officer to the official in charge of a county jail or other place of detention, is sufficient warrant for the detention of the probationer.

In addition, Quintana's continued detention, following issuance of the Texas arrest warrant, was also done pursuant to statutory authority. The Uniform Act for Out-of-State Parolee Supervision (which, as noted above, was in effect at all times pertinent hereto) provides that a "sending state" (in this case, Texas) may permit a person on probation in that state, to reside in a "receiving state" (here, New Mexico) while on probation, under certain conditions and subject to assumption by the receiving state of all duties of supervision. Under this statute, and pursuant to the interstate compact signed by Texas and New Mexico (MR Ex. B), Texas authorities were authorized to enter New Mexico at any time to apprehend and retake Quintana, and:

> [f]or that purpose no formalities will be required other than establishing the authority of the officer and the identity of the person to be retaken. All legal requirements to obtain extradition of fugitives from justice are hereby expressly waived on the part of states party hereto, as to such persons. The decision of the sending state to retake a person on probation or parole shall be conclusive upon and not reviewable within the receiving state; provided, however, that if at the time when a state seeks to retake a probationer or parolee there should be pending against him within the receiving state any criminal

10

> charge, or he should be suspected of having committed within such state a criminal offense, he shall not be retaken without the consent of the receiving state until discharged from prosecution or from imprisonment for such offense.

N.M.S.A. § 31-5-1(C).

As Defendants point out, no one in New Mexico, including the Detention Center where Quintana was being held and its administrators, the Defendants herein, had any authority to challenge the Texas decision to retake Quintana following resolution of the New Mexico charges. As was true of his first detention, the QCDC Defendants were charged with the legal duty of holding Quintana until they received a court order releasing him. Quintana cannot claim a violation of his constitutional rights based on Defendants' actions in fulfilling this duty.

The Arrest Orders and the Texas hold request and formal arrest warrant were all facially valid. Even if they had been erroneously entered (which does not appear to be true in any event), Defendants Garnett and Luera are entitled to absolute immunity for their actions in detaining Quintana pursuant to these warrants and orders. "Simple fairness requires that state officers 'not be called upon to answer for the legality of decisions which they are powerless to control.'" Turney v. O'Toole, 898 F.2d 1470, 1473 (10th Cir. 1990). *See also*, Valdez v. City and County of Denver, 878 F.2d 1285, 1289 (10th Cir. 1989), and Henry v. Farmer City State Bank, 808 F.2d 1228, 1238 (7th Cir. 1986): "Non judicial officials whose official duties have an integral relationship with the judicial process are entitled to absolute immunity for their quasi-judicial conduct."

Plaintiff having failed to raise an issue of fact as to the legality of his detention at QCDC between January 15 and July 19, 1999, and the liability of Defendants for any actions taken in connection therewith, summary judgment is appropriate on this claim. Defendants point out that

Quintana does not state whether they are being sued in their individual or official capacities. However, even assuming that Quintana intended to allege official capacity, the Court need not reach the issues of municipal liability, having found no individual liability against these Defendants. Wilson v. Meeks, 98 F.3d 1247, 1255 (10th Cir. 1996).

### **Denial of Medical Care**

Quintana also alleges that Defendants Garnett and Luera failed to provide him adequate medical care during his incarceration at QCDC, in violation of his Eighth Amendment right to be free from cruel and unusual punishment. He claims that, at the time he was booked into QCDC, he had a broken left wrist and several broken ribs, was in obvious pain and needed immediate medical care, and he informed jail personnel of these conditions. In his response to the Martinez Report, Quintana clarifies that he is complaining of a lack of medical care during his second incarceration beginning January 15, 1999; he makes no complaint regarding the first incarceration from September 25 to November 23, 1998. (Complaint at 2; Response to Martinez Report at 3).

Quintana also alleges in his complaint that he suffers from post traumatic stress disorder (PTSD), which causes him to have severe anxiety attacks when he does not have his medication. He says that his request for medical care was not acknowledged at the time he arrived at QCDC in January 1999 and that it was six months before he received any medical treatment, at which time he was taken to a pediatric doctor. He says in his Complaint that the pediatrician took some x-rays, but he has never seen the results; elsewhere, he claims that no x-rays were taken, even though he requested them (Doc. 15, at 4). Aside from this visit to a pediatrician, he says, "nothing else was ever done about my medical condition." (Complaint at 5).

In his response to the Martinez Report, Quintana alleges that when he requested medical

attention during the intake process on January 15, 1999, he was told "shut up and listen; sit down." He says he filled out a written request for medical attention as soon as he was housed in a cell, and that he thereafter filled out and submitted several additional requests for medical care from January through March of 1999. He claims that all of these requests for medical care are "mysteriously" missing from the Martinez Report documents:

> This is an obvious o[m]ission and is proved by only one request in numerous incarcerations. A rational person would conclude that requests are "missing" or my health is perfect which it is definitely not. However, it does not become necessary to conclude there is a "pattern" of missing medical requests. It is obvious. I ask that you order the Defendants or the Sheriff's Dept. Medical Dept. to provide copies of my medical charts which may reflect more accurately my attempt to be seen by medical personnel. To this day, I have constant pain in my hand, wrist, and elbow due to the lack of medical care.

Plaintiff's Response to Martinez Report (Doc. 15), at 4-5.

The Court already ordered Defendants to produce, as part of the Martinez Report, all medical and treatment notes, sick call requests, and documentation thereof, regarding Quintana's alleged injury to his left wrist, his broken rib and his condition of PTSD, including names of health care personnel who examined Quintana and any reports made by these personnel. The Court further ordered that Defendants produce all medical and treatment notes regarding medical care provide to Quintana in response to the alleged injuries or conditions, the results of any testing or x-rays of his alleged injuries, and the names of any staff at QCDC from whom Quintana requested medical attention. (Doc. 13).

In his affidavit attached to the Martinez Report, QCDC Assistant Director Bennie Martinez states under oath that he personally searched for and reviewed the records maintained by Quay County pertaining to Quintana's incarceration and detention at QCDC, and that the exhibits attached

13

to the Martinez Report constitute all of the records that have been located in the possession, custody or control of the County which the Court ordered to be produced in this matter. (MR Ex. A). With regard to the medical treatment Quintana received at QCDC from January 15 to July 19, 1999, those records show the following.

Upon his arrest and booking on January 15, 1999, Quintana was evaluated for signs or complaints of any obvious pain or injury. The intake sheet completed by QCDC staff indicated that Quintana was not in pain, did not appear to be injured, and was not in need of medical attention at that time. Quintana signed this form. (MR Ex. 16).

He alleges, however, in his response to the Martinez Report, that he was in obvious pain at the time and in need of immediate medical care due to a broken wrist and several broken ribs. He says that he was not asked all of the questions as listed on the intake sheet, and in fact that during the arrest and booking procedures, he specifically told the arresting officers and jail personnel that he needed medical help, but because he was well-known at the jail due to previous arrests "and harassment tactics used by the Quay Co. Sheriff's and D.A.'s office," he was told to "shut up" and was refused medical care. He says that, upon arriving in his cell, he immediately submitted a written request for medical treatment.

The Court has been supplied with no documentation of any requests for medical treatment by Quintana during his 1999 stay at QCDC, other than one on April 5, as discussed below. Defendants assert in a sworn affidavit that they have supplied all medical treatment records and requests related to Quintana's stay at QCDC in 1999. Although Quintana alleges that he made numerous requests for treatment, he does not provide copies of such documents.

On February 10, 1999, Detention Officer Ruben R. Sanchez filed an incident report regarding

14

a disturbance at the Detention Center involving Quintana (MR Ex. 17). Sanchez reported that, after he finished serving lunch to the inmates in Quintana's pod, Quintana banged on the window and yelled at Sanchez, "I told you not to leave this fucking shit in here if it didn't have any salt on it!" Sanchez says he pulled Quintana from the pod into the hall, where Quintana continued to verbally abuse Sanchez. Sanchez restrained and handcuffed Quintana and moved him to the detox unit, where he remained in 48-hour lockdown for verbal assault on an officer.

Quintana states in his response to the Martinez Report that he filled out and submitted several requests for medical care in January, February and March, but "it was not until I complained about my pain and discomfort day after day, week after week that I was finally allowed to see a doctor." (Doc. 15, at 4). There is no documentation of any such written requests by Quintana, and there is no record that Quintana made any complaints of pain to his wrist at the time he was handcuffed on February 10, or any time thereafter until April 5, 1999.

The record documents a written request for medical attention on April 5, in which Quintana states, "Broken wrist has set wrong and is painful – I don't care what doc I see – painful all time can't sleep at night." (MR Ex. 18). The officer taking this request noted that Quintana had a "deformity in the wrist" that was causing pain, and Defendant Luera approved an appointment for Quintana to see James Saltz, M.D., on April 7. Dr. Saltz made a diagnosis of an "old wrist deformity" and depression. He prescribed Chlorzoxazone, a sedative medication used to relieve painful musculoskeletal conditions (PDR, 53d ed., at 2239), and Paxil, an antidepressant also used for relief of panic disorder (PDR, 53 ed., at 3078).

Quintana's medication log shows that he received twice-daily doses of Chlorzoxazone beginning April 8 and continuing until June 9, at which time the notation, "No Refill" is made on the

record. He began taking the Paxil prescribed by Dr. Saltz; however, this was discontinued when it was discovered that he was already taking Paroxetine, which is a generic form of Paxil (*see*, PDR, 53d ed., at 3078). Quintana took Paroxetine on a daily basis from January 16, 1999 until July 19, 1999, the date he was discharged from QCDC. (MR, Exs. 19-22). Quintana also received folic acid on a daily basis, from January 16 to March 2, 1999, and he was given various analgesic medications, including ibuprofen, Tylenol, and aspirin, as well as "cold pills" throughout his 1999 stay at QCDC. (MR Ex. 23).

Under certain conditions, denial or delay of treatment by prison medical personnel can constitute cruel and unusual punishment in violation of the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S. Ct. 285, 291 (1976). "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend evolving standards of decency in violation of the Eighth Amendment [internal quotation marks omitted]." Id., 429 U.S. at 106. The same standard applies to pretrial detainees as well as to convicted prisoners. Barrie v. Grand County, 119 F.3d 862, 866 (10th Cir. 1997).

The "deliberate indifference" standard has two components, one objective and one subjective. Wilson v. Seiter, 501 U.S. 294, 111 S. Ct. 2321 (1991). In order to recover, Plaintiff must make a two-part showing: (1) that the medical need was "sufficiently serious," and (2) that the offending officials acted with a culpable state of mind, in that they knew or must have known about the serious medical need but intentionally refused to provide medical care. Farmer v. Brennan, 511 U.S. 825, 834, 114 S. Ct. 1970, 1977 (1994).

A "serious" medical need is one involving a life-threatening situation, or an instance in which

it is apparent that delay would exacerbate the prisoner's medical problem, or could result in a lifelong handicap or permanent loss. A delay in medical treatment does not violate a prisoner's constitutional rights unless he can show that the delay resulted in substantial harm. <u>Olson v. Stotts</u>, 9 F.3d 1475, 1477 (10th Cir. 1993); <u>White v. Colorado</u>, 82 F.3d 364, 366 (10th Cir. 1996). And "intentional refusal" is more than a negligent diagnosis or an inadvertent failure to provide medical care; rather, Plaintiff must show a "culpable state of mind" to support his claim of denial of a constitutional right. <u>White</u>, at 367; <u>Handy v. Price</u>, 996 F.2d 1064, 1067 (10th Cir. 1993).

Quintana has not raised a genuine issue of material fact as to his "serious" medical need, nor as to the requisite culpable state of mind on the part of the Defendants. Quintana claims that he had a broken wrist and several broken ribs at the time he was booked in to QCDC on January 15, 1999. However, Defendants have presented evidence that Quintana was in no obvious pain, had no injury, and was not in need of immediate medical care at the time of his booking, and Quintana signed the document which makes these assertions. There is no indication that he complained of a broken wrist, or wrist pain, following the February incident in which he was handcuffed. When he made a complaint of wrist pain in April, it was based on a old fracture. He was examined by a doctor following this request, and the doctor found that he had an old injury which had resulted in a deformity.

There is simply no indication in the record that Quintana had anything other than an old injury which hadn't healed properly. He does not raise an issue of fact as to whether he was suffering from a serious medical condition while incarcerated at QCDC in 1999.

Similarly, there is no issue of fact as to whether Defendants knew of a serious medical condition of Quintana's but intentionally refused to provide medical care for this condition. The

17

record shows only that Quintana requested medical attention for wrist pain on April 5, 1999, that he was seen by a doctor on April 7, and that he was given pain killers, muscle relaxants, and other medications throughout his stay at QCDC.

This does not show "deliberate indifference." There was a two-day delay between his April 5 request and the date he was actually seen by a doctor; however, there is no indication that this minor delay resulted in any substantial harm to Quintana. *See,* Olson, at 1477. With regard to his complaint that he suffers from PTSD and suffers anxiety attacks when not given his medication, it is clear that Quintana received antidepressant and anti-anxiety medication throughout his stay at QCDC.

The record as a whole indicates that Quintana received appropriate medical care for his conditions, and no reasonable jury could find otherwise. Summary judgment is therefore appropriate on the issue of denial of medical care.

## Recommended Disposition

That summary judgment be entered in favor of Defendants and the case dismissed with prejudice.

_____
Lorenzo F. Garcia
United States Magistrate Judge